## Leith *v.* Leith.

A divorce procured in another State, under a statute authorizing the decree upon the application of a *bonâ fide* resident, and making the affidavit of the party *prima facie* evidence of the residence, is invalid in this State, if it appears that at the time of the application and of the decree both parties were domiciled here.

The question of residence is open to enquiry in the courts of this State, notwithstanding the record of the proceedings is in due form, and properly authenticated.

LIBEL FOR DIVORCE, filed by the wife for the adultery of the husband. It appeared in evidence that the parties were married in Massachusetts, and in 1846 removed to Winchester, in this county, where they continued to live together as husband and wife until April, 1855, when the husband abandoned her and refused to live with her. In June, 1857, he went to the State of Indiana, and immediately applied for a divorce, and in October of that year a divorce was decreed. It appeared from the evidence that his object in going to Indiana was to obtain the divorce, and not to take up a permanent residence in that State; and that his actual domicil, and also that of the wife, continued to be in this State down to the time of her filing the libel in this case. In 1858, and prior to the filing of this libel, he married another woman, with whom he has ever since cohabited. Other facts in the case, so

Leith *v.* Leith.

far as they are material, sufficiently appear from the opinion of the court.

*Wheeler & Faulkner*, for the libelant.

The evidence establishes the facts of the marriage of the parties, their cohabitation for many years in this State, their continued domicil here, and the marriage of the libelee, and his cohabitation with another woman, since January, 1858. The libelee claims that such cohabitation was not adulterous, because, before it commenced, the parties to this suit had been divorced by the decree of the Circuit Court of the State of Indiana. To this the libelant answers, that however much faith and credit are to be given by our courts, under the constitution and laws of the United States, to the decrees, orders and judgments of the courts of other States, fairly obtained, in relation to matters and persons within their rightful jurisdiction, no credit is to be given to such judgments when procured by fraud, or when rendered concerning matters or persons without their jurisdiction. In this case the decree of the Indiana court must be held void, because that court had no jurisdiction of the parties, neither being a citizen of that State, nor subject to its laws ; and because the decree was obtained by the fraud of the libelee. It is clear, upon the evidence, that the libelee made a flying visit to Indiana, merely for the purpose of obtaining the divorce, and not to establish his home there.

If, however, he had been a *bonâ fide* resident of Indiana, inasmuch as the libellant was never within that State, nor had personal notice of the libel, nor had in any way submitted herself to the jurisdiction of the court, the decree would be void for want of jurisdiction. 2 Kent's Com. 108 ; Story's Conflict of Laws 344–353 ; *Borden* v. *Fitch*, 15 Johns. 121 ; *Bradshaw* v. *Heath*, 14 Wend. 207 ; *Inhabitants of Hanover* v. *Turner*, 14 Mass. 227, 231 ; *Fisher* v. *Lane*, 3 Wilson 297.

It would seem, also, to be the better doctrine, that, even if personal notice had been given to her, she never having been within the State, no jurisdiction could be acquired by the courts of Indiana. *Dorsey* v. *Dorsey*, 1 Law Reporter 288, 289 ; *Bissell* v. *Briggs*, 9 Mass. 462 ; *Thurber* v. *Blackbourne*, 1 N. H. 242 ; *Rangely* v. *Webster*, 11 N. H. 299 ; *Downer* v. *Shaw*, 22 N. H. 277 ; *Eaton* v. *Badger*, 33 N. H. 282.

An attempt is made by the libelee's counsel to distinguish cases of divorce from some of the cases cited above. That in some respects the cases are different ; that the rights, relations and interests involved in the decisions in cases of divorce are different from those affected by the decisions in other cases, cannot be denied ; but it by no means follows that a relaxed or different rule should be applied to such decisions when the question of jurisdiction is to be considered. Whenever the judgment of a foreign court is produced in our courts, either as the foundation of, or an answer to, any proceeding here, the first question concerning it is, had the court which rendered it, jurisdiction ? And if it appear, in the prosecution of this inquiry, that the party objecting to it was, at the time of the inception of the action, without the limits of the State, beyond the reach of the process of the court—no matter what notice, short of personal, and made within the State, may have been ordered and given, under the authority of the laws of the State where the judgment was rendered—the answer is in the negative, and the judgment is treated as a nullity. This is the established rule of the common law, steadily adhered to in all cases where property to the value of one mill is to be affected. Can there be any sound reason for adopting a different rule in a class of cases where not only property, often to a considerable amount, but some of the most important rights and relations of life, are involved ?

The action of our own courts in granting divorces when

Leith *v.* Leith. ·

the applicant has been long a resident of this State, but the other party resides out of the State, and has received such notice only as the court has ordered, has been cited as a precedent for the decision asked for in this case. It is a sufficient answer to say that our courts, while rendering judgments, every term, under the authority of our laws, upon such notice as those laws declare to be sufficient, against defendants who have received no personal notice, have uniformly treated such judgments, when rendered by the courts of other States, and attempted to be enforced here, as nullities. The rule laid down in *Harding* v. *Alden*, 9 Greenl. 140, does not seem to have commended itself to the judgment of the courts of other States. We can find no trace that it has been followed elsewhere, or even cited with commendation; nor are the advantages to be derived from the adoption of such rule—confessedly an innovation—very obvious. If the marriage could be dissolved without affecting persons without the jurisdiction; if the consequences of such dissolution could be confined wholly to the applicant; it might, with some show of reason, be urged that a divorce under the laws of the State in which the applicant lived should be binding every where; but such, unfortunately, cannot be the case. The marriage tie could not be dissolved as to the citizen of one State, without destroying rights and privileges acquired by marriage, legal as well as moral and social, belonging to the citizen of another State; and these rights and privileges the courts of such other State, agreeably to the rule above referred to, would find themselves powerless to protect or enforce, in favor of their own citizen, by reason of the action of a foreign court.

Nor is it easy to perceive on what principle the doctrine can be made to rest, that a portion of the decisions of a court, relative to a matter of which they had rightful jurisdiction, is of universal obligation, so that other courts every where are bound to regard it, and another portion may be entirely disregarded by them.

The rule adopted in England is, that valid divorces can only be granted in the county in which, and according to the laws of which, the marriage was contracted. But the sound rule, as we think, and the one which is supported by the greater weight of authorities, as well as the one which, in its practical operations, is liable to the least objection, is that, without regard to the place of marriage, or the domicil of the parties at the time of marriage, a divorce can only be granted by the courts of the State of their actual domicil.

Under such rule as this, steadily adhered to, the inconvenience, confusion and conflicts so much deprecated by the libelee's counsel would be impossible, and the community would also be spared those other inconveniences, difficulties and dangers which he failed to enumerate, but which are the obvious and necessary consequences of the adoption of the rule for which he contends. The most zealous advocate of the doctrine of free love could hardly ask for greater facilities for reducing the theory to practice, than are furnished by the courts of Indiana to discontented citizens of other States.

The second point of the libelant, is, that the divorce in Indiana was obtained by fraud, and therefore is void. *Duchess of Kingston's Case ; Kilburn* v. *Woodworth,* 5 Johns. 37 ; *Hanover* v. *Turner,* 14 Mass. 227 ; *Borden* v. *Fitch,* 15 Johns. 121 ; *Jackson* v. *Jackson,* 1 Johns. 431 ; 2 Kent's Com. 109.

The libelee, having his domicil in this State, makes a flying visit to Indiana, and while there files his petition for divorce. Accompanying this petition, and as a foundation for it, he files his affidavit, wherein he falsely swears that he is a *bonâ fide* resident of St. Joseph's County, Indiana. All his proceedings after this fraudulent commencement are strongly indicative of fraudulent intent. No personal notice is given to the wife of the pendency of the suit, or of the taking of depositions, although she

Leith *v.* Leith.

lived in the same village with the libelee, and within less than half a mile from the place where the depositions were taken. On the contrary, great pains appear to have been taken to keep her in ignorance of the whole proceeding. What the testimony thus procured in support of the petition was, we have no means of knowing, but inasmuch as the libelee's testimony in this case no where supports the allegations of the libel in Indiana, it is but fair to conclude that that also was false and fraudulent.

It would be a presumption too derogatory to the character of the Indiana court to presume for a moment that they would not have denied the petition at once, had the real facts, as they now appear by the libelee's testimony, been disclosed to them.

It was in fraud, too, of the laws of this State. A citizen of this State, dissatisfied with his marriage ties, and desirous of assuming new and more agreeable ones, but wholly without cause for asking a dissolution here, resorts to the tribunals of another State, and there, by false representations as to citizenship, and for alleged causes which, if true, would not warrant a divorce in the State of his domicil, obtains a divorce; and then, remarrying, asks the courts of the State of his domicil to protect him in his new relations, to refuse his former wife any allowance from his property, and to give him the authority of judicial sanction for what he has for the last three years done arbitrarily—separating her from her children.

If the position of the libelee should be sustained by the court, " we should," in the language of the Supreme Court of Massachusetts, in *Hanover* v. *Turner*, " permit another State to govern our citizens, in direct contravention to our own statutes, and this can be required by no rule of comity." In the language of Chief Justice *Gibson*, in *Dorsey* v. *Dorsey*, it would be " in truth a usurpation of power to intermeddle with the domestic concerns of a neighbor. If a *bonâ fide* domicil, in the strictest

sense of the word, was not essential to jurisdiction, there would be nothing to prevent the exhibition of a libel by a proctor, and without the presence even of the complainant."

*F. F. Lane,* for the libelee.

Fraud is a fact to be established by evidence, and not to be assumed. or presumed in any case ; nor is it to be found upon slight, doubtful or ambiguous circumstances. Possibly frauds may be perpetrated, and courts imposed upon, but they are so contrary to general experience as to call for the most stringent and conclusive evidence.

In this case. the libelant points out no specific acts of fraud, and it is difficult to conceive what there is in the case that she may regard as a fraud upon our laws, or upon the courts of Indiana. There is no evidence of deceit practiced upon the court of Indiana to mislead it, nor upon the laws of this State.

The Indiana statute requires applicants for divorce to be " *bonâ fide* residents." The evidence upon this point before the court of Indiana satisfied that court that this was made out, and whether such evidence would be sufficient to satisfy all the other courts in the country of the same fact, is not an open question in considering the judgment and the effects of it pronounced in that case. The libelee was, therefore, not only a *bonâ fide* resident of Indiana when he filed his petition for a divorce, and when the bill was granted, but, if there is a difference, he had his domicil there also. There was, then, no fraud upon the courts of that State in this particular.

It is also difficult to see any evidence of fraud upon the laws of this State. He was only a resident of this State, where he had lived but a few years, and owed allegiance to the State, and duty to its laws, only while he lived here. He was not born here ; his wife was not born here ; the marriage contract was not made here, nor the

marriage ceremony celebrated here; neither of them had been previously, nor were at the time, residents of this State, nor subject to its laws. They were both born in another State, were citizens of another State, the marriage was contracted and consummated in another State, and derived its force and validity from the laws of that State. Where, then, is the fraud upon the laws of this State? And what right has this State to complain if the contract is annulled by the judicial tribunals of a foreign government; and what difference does it make to our State whether it is annulled by the courts of Massachusetts or Indiana? Before this decree was made the parties lived here, under our laws, in the relation toward each other established by the laws of another State, and afterwards they remain here under the legal relations corresponding with the annulment of such contract.

The other objection is, that the court of Indiana had not jurisdiction in the case, because the libelee was never a *bonâ fide* resident of that State, and because the libelant was not within the jurisdiction of the court, and did not receive personal notice.

It seems to us that the position that the libelee was a *bonâ fide* resident of Indiana, and had his domicil there, is well made out in fact and in law. This gave the court jurisdiction, certainly as to him. In his petition there were several causes stated, which, if made out in evidence, authorized the court, under the laws of that State, to decree a divorce; and some of these causes required no longer existence and continuance, in fact, than the time he was in the State previous to filing his petition. And it does not appear that the decree of that court was not based on these causes, and such may well be presumed to be the fact. These two facts being established, to wit: the fact that he was a *bonâ fide* resident of that State, and that the cause on which the decree was based was consummated while he was living there, brings the case within

the rule which this court laid down in the case of *Payson* v. *Payson*, 34 N. H. 518. The two cases are parallel in all their important features.

But it is still said that the judgment of the court of Indiana is void for want of jurisdiction. *Downer* v. *Shaw*, 24 N. H. 277. That case belongs to a different class than the one under consideration, and a different rule may prevail. What would be the inevitable consequences of holding this doctrine in cases of divorce? If such be established as the law through the country, it would follow that the divorce in *Payson* v. *Payson*, and the class of divorces of that kind, which embraces a large portion in almost every State, would be valid and binding in the State where granted, and void every where else. A new marriage might be contracted in such State, legal in its character, and the issue would be legitimate, while in every other State the relation thus formed would be illegal, void and criminal, and the issue illegitimate. One kind of relations, one kind of duties and one kind of obligations—legal, moral and social—would exist in one State, while in every other State, wherever the parties might happen to be, such relations, duties and obligations would be converted into crime, immorality and disgrace. Such a doctrine would deprive divorces in many cases of their main advantages. It would, furthermore, be a trap to crime to the parties, and a heritage of ignominy and disgrace to their innocent offspring. The evils attending it would be numerous, and of the gravest character, and, if possible, should be avoided.

In the States of this Confederacy, where all united constitute one State and one country and one people, in connection with the migratory habits of the people, such a rule, with such consequences, should be established only from necessity. True State comity is opposed to it; the interests of public peace and the necessity of escaping great public evils and personal calamities, are opposed to it.

Leith *v.* Leith.

The important inquiry, under these circumstances, is, whether there is not another rule applicable to cases of divorce; one, perhaps, not entirely free from objections, but that will avoid all these grave consequences; one that is more just and wise, and one that is better adapted to the more modern and liberal policy of the States relating to divorces, and to the true interests of one people. We think there is, and that rule is laid down by the Supreme Court of Maine, in *Harding* v. *Allen*, 9 Greenl. 140, cited with approbation in 2 Kent's Com. 110, note (b).

The rule established in that case seems to be that a decree of divorce does not fall within the rule that a judgment rendered against a person not within the State, nor bound by its laws, nor amenable to its jurisdiction, is not entitled to credit against the defendant in another State; but that divorces pronounced according to the law of one jurisdiction, and the new relations thereupon formed, ought to be recognized, in the absence of all fraud, as operative and binding every where, so far as relates to the dissolution of the marriage, though not as to other matters that the decree may contain, such as an order for the payment of money. If this rule is an innovation, and in conflict with the precedents of the past, it certainly is free from technical reasoning, is commended by its good common sense, and meets the wants and demands of the present advanced state of society.

And again, this rule is only a strict compliance with the provisions of the constitution and laws of the United States. The constitution, art. 4, sec. 1, provides that " full faith and credit shall be given in each State to the public acts, records and judicial proceedings of every other State. And the congress may, by general laws, prescribe the manner in which such acts, records and proceedings shall be proved, and the effect thereof." Congress has passed a law declaring that they " shall have such faith and credit given to them in every court within

the United States, as they have by law or usage in the courts of the State from whence the said records are or shall be taken." 1 U. S. Laws, 115.

By virtue of these provisions the Supreme Court of the United States holds that a judgment is conclusive in every other State, if a court of the particular State where it was rendered would hold it conclusive. *Mills* v. *Duryee*, 7 Cranch 480 ; *Hampton* v. *M' Connell*, 4 Wheaton 234. According to this view, our defence is fully made out. There was a judgment of divorce granted to the libelee against the libelant, by a competent tribunal of Indiana, where such judgment would be conclusive, and should, therefore, be so held here. And the libelant has no grounds to ask for a bill, because the libelee is not her husband. The marriage has been already dissolved.

SAWYER, J. The libel in this case alleges that the parties were married in Massachusetts, on the 22d day of April, 1844, and that from that time until the 8th of April, 1855, they resided together as husband and wife, having their domicil from the 8th of April, 1846, until the time of filing the libel, in Winchester, in this county. The cause of divorce alleged is the adultery of the husband, and the prayer is for a decree of divorce and for alimony. The facts proved by the libelant in support of the alleged cause of divorce are not denied or attempted to be controverted ; but the answer which is made to them by the libelee is, that his cohabitation with another woman than the libelant, clearly showing the adultery, unless the cohabitation is proved to be lawful by evidence of a legal marriage between the parties to it, was not adulterous, because the libelee had previously obtained a divorce from the libelant, by the decree of a court of competent jurisdiction in the State of Indiana, and had been married to the woman with whom he had so cohabited. The reply of the libelant to this is, that the Indiana court

had no such jurisdiction of the cause and of the parties to it as to give validity to their proceedings; that a fraud was practiced by the libelee upon that court, and upon the law in reference to his domicil upon which the jurisdiction depended, such as to render the proceedings, and the decree in which they resulted, void. This presents the only questions necessary to be considered in the case. Upon all other points the case of the libelant, as set forth in her libel, is fully maintained by the proof, and equally so by the testimony taken by the libelee as by that of the libelant. He admits the marriage of the parties, as alleged; their subsequent cohabitation until April, 1855; his desertion of the libelant at that time, and his marriage in January, 1858, and subsequent cohabitation with another woman; and he claims that these were lawful, because in October, 1857, he was, as he alleges, lawfully divorced from the libelant, and therefore free to contract the second marriage.

The parties at the time of their marriage, and subsequently until April, 1846, had their domicil in Massachusetts. On the 8th of that month they removed to Winchester, in this State, and took up their residence there, where they continued to reside together until April, 1855, when he carried her to her sister's, in Conway, Mass., and engaged her board there for an indefinite time, and returned immediately to Winchester. She remained at her sister's a few weeks, and then came back to Winchester. He declined to live with her, but paid for her board at the public hotel, and in different private families, until September, 1856, since which time he has in no way contributed to her support.

A very considerable amount of testimony has been taken by each of the parties, relative to their conduct and deportment to each other during their matrimonial life, which is unnecessary to be considered. Whether he deserted her without sufficient cause, or had sufficient

grounds, in the violence of her conduct and displays of ungovernable temper, to constitute a legal answer to her application for divorce, on the ground of his desertion because of them, are matters immaterial to the question as to the validity of the Indiana divorce and the legality of the second marriage.

In reference to the domicil of the parties from April, 1846, down to the time of filing the libel in this case, the evidence fully satisfies us that it was in Winchester ; that the visit of the libelee to Indiana, in June, 1857, was merely for the purpose of procuring the divorce, and that his intention was, after he had accomplished that purpose, to return to his domicil in this State, as he in fact did.

By the statute of Indiana regulating divorces, under which the proceedings were had, it is enacted that divorces may be decreed by the Circuit Court of the State, on petition filed by any *bonâ fide* resident of the county in which the same is filed, of which *bonâ fide* residence the affidavit of the party shall be *primâ facie* evidence. The statute then proceeds to declare what shall constitute a cause of divorce, and to prescribe the course of proceedings in obtaining the decree. Among the causes enumerated are several not recognized as such by our laws ; and the causes set forth by the libelee, in his petition, were of that character ; and it appears from the allegations of the petition that they arose while the parties were, according to the statements of the petition, and in fact, domiciled in this State. When the acts were committed which constituted the alleged causes of divorce, they did not amount to a violation of the marriage contract of which the law could take cognizance in this jurisdiction, where they were committed, and where the parties were domiciled ; neither as a ground for divorce, nor as an infraction of the criminal law. In the exercise of our own jurisdiction, in cases of divorce, the rule is firmly established in this State, that divorces are not to be decreed for causes which

Leith *v.* Leith.

arose before the parties were domiciled here. *White* v. *White,* 5 N. H. 466 ; *Clark* v. *Clark,* 8 N. H. 21 ; *Fellows* v. *Fellows,* 8 N. H. 160 ; *Frary* v. *Frary,* 10 N. H. 61 ; *Smith* v. *Smith,* 12 N. H. 80 ; *Greenlaw* v. *Greenlaw,* 12 N. H. 200 ; *Kimball* v. *Kimball,* 13 N. H. 225 ; *Bachelder* v. *Bachelder,* 14 N. H. 380 ; *Payson* v. *Payson,* 34 N. H. 518 ; *Hopkins* v. *Hopkins,* 35 N. H. 474. The same rule prevails in Pennsylvania. *Dorsey* v. *Dorsey,* 7 Watts 349 ; *Hollister* v. *Hollister,* 6 Barr 449 ; *McDermott's Appeal,* 8 Watts & Serg. 251. In Massachusetts the same rule was recognized in their early decisions ; *Hopkins* v. *Hopkins,* 3 Mass. 158 ; *Carter* v. *Carter,* 6 Mass. 268 ; though they would seem to have been to some extent merely cases of the construction of local statutes. *Harteau* v. *Harteau,* 14 Pick. 181. The rule is adopted in their Revised Statutes, ch. 76, sec. 11, and subsequent decisions in that State are rather adjudications under the statute than expositions of the law, on this point, upon general principles. *Brett* v. *Brett,* 5 Met. 233.

In most American courts, however, the doctrine is maintained that the actual *bonâ fide* domicil of the parties at the time the proceedings are instituted is the proper ground for assuming the jurisdiction, irrespective of the time and place of the *delictum,* and of the domicil when it occurred. Bishop on Mar. & Div., sec. 721 *et seq.,* and authorities cited. Story's Conf. of Laws, sec. 230 (note a). The principle at the foundation of this doctrine in those jurisdictions where it prevails, is, in the language of Chief Justice *Taney,* in *Strader* v. *Graham,* 10 How. 82, that " every State has an undoubted right to determine the *status,* or domestic and social condition of the persons domiciled within its territory." In this view, questions of marriage and divorce are not so much questions of contract as of *status* or condition ; and according to the well settled principles of international law, that every nation has exclusive sovereignty and jurisdiction

within its territory, and that no government can exercise a direct authority beyond the limits of its dominion, the *status* of every actual *bonâ fide* resident, as married or single, must be determined according to the law of the domicil, without reference to the law of the place of the marriage, or of the place where the *delictum* occurred. *Harding* v. *Alden,* 9 Me. 140 ; *Tolen* v. *Tolen,* 2 Blackf. 407 ; *Jackson* v. *Jackson,* 1 Johns. 424 ; *Pawling* v. *Bird,* 13 Johns. 192 ; *Barber* v. *Root,* 10 Mass. 260 ; *Pomeroy* v. *Wells,* 8 Paige 406 ; *Maguire* v. *Maguire,* 7 Dana (Ky.) 181.

Conceding this to be the true rule upon the subject, and that each State may therefore rightfully declare the condition of its own citizens in reference to the marriage relation, and that, consequently, when a divorce is decreed according to the local law, in the forum of the parties' domicil, it is to be regarded in all other jurisdictions as valid ; still the rule applies only to the case of one actually and *bonâ fide* a resident *animo manendi,* and not to one temporarily there for a transient purpose, and still less to one who, in fraud of the law of his domicil, resorts thus temporarily to the foreign tribunal for the express purpose of evading the laws of his own jurisdiction, by procuring a divorce there for a cause which is not allowed in the domestic forum. Upon this point the authorities have great uniformity. *Lane* v. *Lane,* 2 Mass. 167 ; *Squire* v. *Squire,* 3 Mass. 184 ; *Choate* v. *Choate* 3 Mass. 391. In *Barber* v. *Root,* 10 Mass. 260, the parties were married, and had their domicil in Massachusetts, but subsequently removed to Vermont, and resided together there until divorced by a decree of the court of that State, for a cause of divorce not recognized as such in Massachusetts, and the question was, whether the divorce was to be held valid in the latter State. *Sewall,* J., in delivering the opinion of the court says, "the jurisdiction of the parties between whom the divorce was decreed must be considered as well established by their residence together in

Vermont, in a manner that proves a permanent domicil there before the suit for a divorce was commenced, and which continued when the decree was obtained. The Vermont tribunals had, therefore, an exclusive jurisdiction. The *lex loci* by which the conduct of married persons is to be regulated, and their relative duties determined, and by which the relation itself is in certain cases to be annulled, must always be referred, not to the place where the contract was entered into, but where it subsists for the time ; where the parties have had their domicil, and have been protected in the rights resulting from the marriage contract, and especially where they are or have been answerable for any violation of the duties incumbent upon them in that relation." "The laws of Vermont," he adds, "which authorize the courts of that State to proceed in suits for divorce instituted in favor of persons resident for a time but having no settled domicil within the State, are not to be justified by any principles of comity which have been known to prevail in the intercourse of civilized States."

In *Hanover* v. *Turner*, 14 Mass. 227, the question arose directly, whether a divorce obtained in Vermont, to which State the libelant had removed from Massachusetts, for the purpose of availing himself of the laws of the former State to obtain the divorce, was to be regarded as valid in the latter. *Putnam*, J., says, "if the libelant had been absent for years in another State, or in a foreign country, for lawful purposes of business, *animo revertendi*, no question would arise of a change of domicil, *a fortiori*, when his temporary absence was for the purpose of evading the laws of this commonwealth." "If," he continues, "we were to give effect to this divorce we should permit another State to govern our own citizens, and this can be required by no rule of comity." In the more recent case of *Lyon* v. *Lyon*, 2 Gray 367, the husband applied for a divorce in Massachusetts, on the ground of desertion by the wife.

At the time of the desertion the parties were domiciled in that State, and the desertion by the wife was without cause. She subsequently went to Rhode-Island, and there procured a divorce for an alleged cause arising while the parties were domiciled in Massachusetts, the residence of the husband still continuing there—and the question was, whether the divorce so procured by the wife in Rhode-Island was a dissolution of the marriage, so as to bar the husband from a decree of divorce in Massachusetts for the desertion. It was held that the wife, having voluntarily abandoned the husband without justifiable cause, acquired no residence in Rhode-Island, her domicil still continuing with the husband in Massachusetts, and that the proceedings in granting her a divorce were in fraud of the law of the domicil, and therefore void. Although the case was held to be within the statute of Massachusetts which pronounces a divorce so procured invalid in that State, still, it is said, by the learned Chief Justice *Shaw*, that if not within the statute, the decree would be void upon general principles of justice and policy; partly on the ground that it was a proceeding in fraud of their law, and partly because the courts of Rhode-Island could have no jurisdiction of the cause and of the parties. In *Harding & ux. v. Alden*, 9 Me. 115, the principle of the Massachusetts cases was fully recognized. The parties to the divorce in that case resided together in Maine, until the husband deserted the wife, and took up his residence in North-Carolina. The wife, after the desertion of the husband, went to Rhode-Island, and there acquired a new domicil, the husband never having resided there. She obtained a divorce in that State on the ground of the adultery of the husband in North-Carolina, and the divorce was held valid in Maine, upon the ground that she, being a *bonâ fide* resident of the State in which the divorce was decreed, was within the jurisdiction of the courts of that State, and entitled, because of her domicil there, to be

relieved from the claims of her husband upon her, arising from the conjugal relation which he had forfeited. In the able opinion delivered by *Weston, J.*, he says, "most of the reasons which led to the adoption of the rule that a marriage, valid by the law of the place where solemnized, is valid every where, require that divorces lawfully pronounced in one jurisdiction should be recognized as binding every where." "To these," he adds, "may be excepted cases of fraud and collusion, of which class are decrees obtained in fraud of the law of the domicil of the parties;" and he refers to *Hanover* v. *Turner*, and *Jackson* v. *Jackson*, 1 Johns. 424, as cases decided upon the principle of this exception.

This case of *Jackson* v. *Jackson* was a divorce procured in Vermont by the wife, who left the State of New-York and went to Vermont for the purpose of obtaining the divorce. It was held that the wife acquired no such domicil in Vermont, by her temporary residence there for that purpose, as would give validity to the decree, and that the proceeding was to be regarded as a fraud upon the law of the domicil. In the case of *Borden* v. *Fitch*, 15 Johns. 121, the principle upon which *Jackson* v. *Jackson* was decided is recognized and affirmed.

The doctrine to be deduced from these cases clearly is, that where a divorce is granted on the application of one who is not a *bonâ fide* resident within the jurisdiction, having an actual permanent domicil *animo manendi*, but is resident there temporarily, for a transient purpose only, and *a fortiori* if the residence is taken for the purpose of availing himself of the laws of that jurisdiction, to obtain a divorce which would not be granted in the forum of his actual domicil, the decree of divorce is void. To give effect to a divorce thus obtained would be an infringement of the sovereignty of the State of the domicil over its own citizens, as it would recognize the right of a foreign jurisdiction to declare judicially the status and condition

of a husband and wife in reference to the marriage relation, both of whom are domiciled here, and when neither, by becoming an actual resident there, had carried the relation into that jurisdiction. To maintain the doctrine of these cases it is unnecessary to deny to any State the right to decree the divorce of any actual *bonâ fide* resident for any cause and by any proceedings, recognized as lawful within its own territory, and as having application to its own citizens, irrespective of the questions where was the marriage solemnized; when and where did the cause of divorce arise; where has the domicil of the parties previously been, and where that of the party defendant then is; and it is equally unnecessary to deny that when a divorce is thus granted, if lawful and valid in the place of the domicil of the party whose *status* and condition in reference to the marriage relation is the subject of the decree, is valid and binding here. This, however, is to be taken with the same qualification that attaches to the proposition that a marriage, valid by the law of the place where it is solemnized, is valid every where; namely, that the law of the marriage in the one case and of the divorce in the other, is not in violation of principles which are of universal obligation, and recognized by the *jus gentium* in all civilized communities; and that, consequently, if the law of the divorce should place the marriage substantially at the pleasure of the parties, a divorce declared under it would have no more validity here than would an incestuous or polygamous marriage, contracted in a community whose domestic policy might allow such a violation of natural and moral law.

It may be conceded that when a citizen of one State transfers his domicil to another, he places his *status,* as married or single, as he necessarily must every relation which is *juris gentium* and not merely the creation of municipal law, under the laws of his new domicil, while that continues. If, however, his mere transient visit to such

other State, while his domicil remains unchanged, is to be regarded as bringing his *status* in regard to the marriage relation within the jurisdiction to which he thus temporarily resorts, conflicts of laws in the numerous jurisdictions of this country must be of constant recurrence, and questions, more embarrassing and distressing than those which at times have perplexed the courts of England and Scotland, arising from the conflict of their laws on the subject of divorce, must be of almost daily occurrence in the American courts.  The universal recognition of the two principles, that each State may rightfully declare and adjudicate as to the marriage relation of its own *bonâ fide* citizens, and of no other; and that a divorce, lawfully decreed according to the law of the actual domicil, subject to the qualification above stated, is good in all other jurisdictions, even that in which the other party to the marriage is domiciled, would go very far to remove all such conflict.  The former of these two principles is declared by *Story*, in his Conflict of Laws, sec. 230 (note a), to be firmly established as the doctrine of American courts. *Bishop*, in his treatise on Marriage and Divorce (sec. 720), also says its authority is now fully acknowledged in this country.

In reference to the latter principle, it is said in the same treatise (sec. 731), the granting of a divorce to the husband or wife, in the State of his or her actual domicil, while the other party is domiciled in another State, is no interference with the rights of that State, or of its apparently divorced subject.  The decree would not be directly binding upon the person of such subject, except in case of appearance and answer to the suit, or at least of a notice personally served within the jurisdiction of the court rendering it.  The husband, in case of such divorce by the procurement of the wife, would not be bound by any collateral clause in it, as that he should pay alimony, and he would only cease to be a husband because he had ceased

to have a wife. To the same extent he would be affected by her death. The government of the country of his domicil could not complain; its laws and domestic policy would not be interfered with; it might still prohibit him, if it chose, from contracting another marriage, in the same manner as if the former had not been dissolved.

Nor is the doctrine that a divorce, granted in another State, where the party applying is domiciled, may be held valid here, although the domicil of the other party has continued to be in this State, and the cause of divorce arose while the parties had their domicil together here, at all in conflict with the decisions here, that divorces are not to be granted for causes accruing prior to the time when the party applying became a permanent resident in this State. Each State is at liberty to adopt such policy in reference to the divorce of its own citizens as they may deem most conducive to social and public morals, and the best interests of the State, and this policy may be declared by statutory provisions, or by the adjudications of their courts, when not controlled by statute, upon such principles of law as they may deem most consonant to sound reason and to their general domestic polity. When, therefore, the courts of this State decline to take jurisdiction of an alleged cause of divorce which accrued while the parties were domiciled elsewhere, they in effect declare that the principles of law, as here recognized, and sound public policy, as here estimated, forbid such divorces of our own citizens. But when one of our citizens removes to Indiana, and acquires a permanent domicil there, he carries with him, and places under the jurisdiction of their laws, the marriage relation which he sustained at the time of the change of domicil, subject to all the defects and infirmities which their laws may attach to it; and if by their laws acts such as are charged to the wife in the husband's libel, in this case, committed by her in this State, while the parties were domiciled here, may so impair the

Leith *v.* Leith.

marriage relation, according to their policy, that the husband, now a citizen of that State, ought not to be held to its duties, it is but the exercise of their sovereignty over their own citizens to release him from the marriage tie, however unwise it may be, according to our notions of public policy thus to exercise it.

Upon every view which can be taken of the case, the divorce in Indiana might be sustained in the courts of this State if the fact appeared that the husband, at the time of the application, and of the proceedings which resulted in the decree, was a *bonâ fide* resident of that State. The meaning of the expression, *bonâ fide* resident, as used in the Indiana statute, cannot be matter of doubt. It must be understood as equivalent to inhabitant; one dwelling and having his fixed and permanent home within the State.

It is objected, however, that the question of the actual residence of the libelee at the time of the proceedings in the Indiana court, is not open to the inquiry of this court, because, by the provision of the constitution of the United States, full faith and credit are to be given in each State to the public acts, records and judicial proceedings of every other State; and Congress may, by general laws, prescribe the manner in which they shall be proved, and the effect thereof; and by the act of Congress of May 26, 1790 (1 Stats. at Large 122), in pursuance of this provision it is declared that they shall have such faith and credit given to them in every court within the United States as they have by law or usage in the courts of the State from which they come.

The doctrine of the cases, *Mills* v. *Duryee*, 7 Cranch 481, and *Hampton* v. *McConnell*, 8 Wheat. 234, cited on this point by the counsel for the libelee, that a judgment which is conclusive as record evidence in the courts of the State where it was rendered, is to have the same faith and credit, and therefore to be held conclusive in every

other court, is to be taken subject to the qualification that in all instances the jurisdiction of the court rendering the judgment may be inquired into. It is only when the jurisdiction is not impeached, either as to the subject matter or the person, that it is entitled to this credit. This has always been the doctrine of the State courts, including, as I understand it, those of Indiana herself; *Bissell* v. *Briggs,* 9 Mass. 462; *Hall* v. *Williams,* 6 Pick. 232; *Aldrich* v. *Kinney,* 4 Conn. 380; *Kilburn* v. *Woodworth,* 5 Johns. 37; *Pawling* v. *Bird,* 13 Johns. 192; *Starbuck* v. *Murray,* 5 Wend. 148; *Shumway* v. *Stillman,* 6 Wend. 447; *Hoxie* v. *Wright,* 2 Vt. 263; *Benton* v. *Burgot,* 10 Serg. & Rawle 240; *Rogers* v. *Colman,* Hardin (Ky.) 413; *Eastman* v. *Jones,* 2 Yerg. 484; *Miller* v. *Miller,* 1 Bailey 242; *Holt* v. *Alloway,* 2 Blackf. 108; and is now the settled doctrine of the Supreme Court of the United States. *McElmoyle* v. *Cohen,* 13 Pet. 323. In the case last cited it was held that a judgment in one State has the force of a domestic judgment in another, under the constitution of the United States, only so far as to preclude all inquiry into the merits of the subject matter of the judgment. *Wayne,* J., in delivering the opinion, says the decisions in *Mills* v. *Duryee* and *Hampton* v. *McConnell* were not intended to exclude inquiry into the jurisdiction of the court in which the judgment was given, to pronounce it as the right of the State itself to exercise authority over the person or the subject matter. If, then, the proceedings in the Indiana court were to be regarded in this respect as a civil suit between two parties, in which their rights and liabilities as to each other were involved, it is clear that the judgment pronounced in it would have no effect beyond the limits of the State in which it was rendered, because the party against whom it was rendered was never subject to the jurisdiction of that State, did not appear and answer to the suit, and had no notice of its pendency served upon her. This is not a suit of that

character, but rather one in the nature of a proceeding *in rem*, the object and effect of which are to define the *status* of the complainant in that proceeding as a citizen of Indiana, in reference to his marriage relation with the present libelant. The case of *Harding & ux.* v. *Allen*, in Maine, proceeds upon this view, and the decision in that case is referred to in 2 Kent's Com. 110 (note a), as an important and valuable decision. In this view the subject matter of the Indiana suit was the obligation of the complainant to support the present libelant as his wife, and to discharge toward her the duties of a husband; and of this the court in Indiana had no jurisdiction, unless he was at the time one of the citizens of that State.

It is not at all clear that this objection does not admit of another answer, namely, that under the peculiar provisions of the Indiana statute the question as to the validity of a divorce granted under it is open in her own courts, in any subsequent proceedings in which the divorce may be alleged. The statute authorizes a divorce in terms only in case of an application by a *bonâ fide* resident, but it empowers the court to proceed and decree the divorce upon proof by the affidavit of the party of his *bonâ fide* residence; that is, in effect it declares that the divorce may be decreed in cases where the other party does not appear, if the applicant will file his affidavit that he is a *bonâ fide* resident, whether he is so in fact or not. The record of the proceedings in this case shows that the affidavit was filed, but it does not show that there was any other evidence of residence, or that there was any inquiry or adjudication by the court as to the question of *bonâ fide* residence in fact. There is nothing in the decree, the record of the proceedings, or the nature of them, from which it can be understood that this was at all the subject of consideration by the court. From the character of the enactment it would seem that in order to carry out its policy, the court would be bound to make no inquiry into the fact

of residence, and to hold that the fact of the affidavit filed was sufficient in all cases, until disproved by the adverse party. The statute authorizes them, upon the filing of the affidavit, whether true or false, to waive all inquiry into the matter of *bonâ fide* residence, unless counter evidence is presented by the adverse party ; and by declaring it competent for them to decree the divorce upon this *primâ facie* evidence, though false, impliedly enacts that in a case where the other party does not answer to the suit, the divorce thus granted is to be taken by the party upon whose false affidavit as to his residence it is granted, at the peril of an after inquiry into the truth of his statement. The conclusive character of a judgment rests upon the fact of an investigation and inquiry into the merits of the subject matter by a court of competent jurisdiction, or upon a concession of the merits by the party having adverse interests, who has opportunity to be heard, and whose concession is equivalent to an examination upon full proofs. Upon this point of residence the record in this case has none of the characteristics of a judgment. It would be a judicial farce to hold it conclusive upon this point in the court from which it comes. It is difficult to see how, upon any sound principles, even there, it can be held to be any thing more than a proceeding preliminary to the question of the validity of the divorce, to be tried in some after suit, like an indictment for bigamy, an action for necessaries supplied to the wife ; or, as in this instance, a libel for divorce by the party who has been outraged by a decree thus obtained.

If, however, the judiciary of that State should adopt a laxity of principles upon the subject of divorce in their judicial proceedings corresponding to that of their legislature in the enactment, and hold the decree to be conclusive in their own courts as to the residence, still, upon the other ground, no doubt can be entertained that the question, whether the complainant in the proceeding had a *bonâ fide* residence there, is open in our courts. The proofs are

clear that he acquired no domicil in Indiana, but his residence was then, and is now, in this State, and consequently the divorce in Indiana must be held to be a nullity.

*Divorce decreed, and alimony to the amount of $750 allowed to the libelant.*